**PITTSTON COMPANY ULTRAMAR AMERICA LIMITED, a Corporation of the State of Delaware; Ultramar Petroleum, Inc., a Corporation of the State of Delaware, Intervenor–Plaintiffs,**

**v.**

**ALLIANZ INSURANCE COMPANY, a Corporation of the State of California; Allstate Reinsurance Company, a Corporation of the State of Illinois; American Centennial Insurance Company, a Corporation of the State of Delaware; American Insurance Group, a Corporation of the State of California, a/k/a American Marine Insurance Group; American Marine Underwriters, Inc., a Corporation of the State of Wisconsin; Ancon Insurance Company, a Corporation; Citadel Assurance Company, a Corporation of Canada, a/k/a Citadel General; Employers Insurance Compa-**

ny of Wausau, a Corporation of the State of Wisconsin, a/k/a American Marine Underwriters; INSCO, a Corporation; Insurance Company of North America, a Corporation of the State of Pennsylvania; Insituto De Reasseguros Do Brasil; IRB, a British Corporation, a/k/a Price Forbes Limited; The Lumbermens Mutual Insurance Company, a Corporation of the State of Illinois; Mentor, a Corporation; Societa Italiana Assicurazioni Transporti, a Corporation of Canada, a/k/a S.I.A.T.; Sphere Drake Underwriters, a Corporation; The Charter Oak Fire Insurance Company, a Corporation of the State of Connecticut; The Hartford Insurance Company, a Corporation of the State of Connecticut; *Travelers Indemnity Company, a Corporation of the State of Connecticut; United States Fire Insurance Company, a Corporation of the State of New York; Underwriters at Lloyd's of London, which include; Alliance Insurance Company, Ltd.; Andrew Weir Insurance Company, Ltd.; Bishopsgate Insurance Company, Ltd.; Drake Insurance Company, Ltd.; Edinburgh Assurance Company, Ltd.; English & American Insurance Company, Ltd.; Hansa Marine Insurance Company, Ltd.; Insurance Company of Ireland, Ltd.; Orion Insurance Company, Ltd.; Sphere Insurance Company, Ltd.; Threadneedle Insurance Company, Ltd., with said companies existing under the laws of the United States, the laws of some sovereign power, or as an underwriter at Lloyds of London; Does, 1–1000; Bellefonte Insurance Company, Ltd.; Gibbs and Companies; Minister Insurance Company No. 3; Nippon Fire & Marine Insurance Company (UK), Ltd.; Ocean Marine Insurance Company, Ltd.; Skandia (UK) Insurance Company, Ltd., per Orion Insurance Company, Plc. Group Et.; Switzerland American Insurance Company, Ltd.; Yasuda Fire & Marine Company, (UK) Ltd.; Andrew Weir Insurance Company, Ltd. SBA/C; Andrew Weir Insurance Company, Ltd. Group; Andrew Weir Insurance Compa-

ny, Ltd. 'W'; Andrew Weir Insurance Company, Ltd. NZSB; Chiyoda Fire & Marine Insurance Company; Rochdale Insurance Company; Unigard Mutual Insurance Company; Unione Italiana; United Americas; Andrew Weir Insurance Company; Assicurzaioni Generali S.P.A.; British Law Insurance Company; British Reserve Insurance Company, Ltd. No. LA/C; Commercial Union Assurance Company, Ltd.; Excess Insurance Company, Ltd.; La Reunion Francaise S.A. D'Assurances; Minister Insurance Company, Ltd. No. 2A/C; National Insurance Company Of New Zealand, Ltd.; Nippon Fire & Marine Insurance Company, Ltd.; Nippon Fire & Marine Insurance Company, Ltd. TLA/C; English & American Insurance Company, Ltd.; Northern Assurance Company, Ltd. Group; Phoenix Assurance Company, Ltd.; Polaris–Norske SJO Insurance Company, Ltd. "NT"A/C; Provincial Insurance Public Limited Company; Road Transport Insurance Company, Ltd.; Road Transport & General Insurance Company, Ltd.; Scottish Lion Insurance Company, Ltd.; Protective Insurance Company

Pittston Company; Allianz Insurance Company; Allstate Reinsurance Company; American Centennial Insurance Company; American Insurance Group; American Marine Underwriters, Inc.; Ancon Insurance Company; Citadel Assurance Company; Employers Insurance Company of Wausau; INSCO; Insurance Company of North America; Insituto de Reasseguros do Brasil; IRB; The Lumbermens Mutual Insurance Company; Mentor; Societa Italiana Assicurazioni Transporti; Sphere Drake Underwriters; The Charter Oak Fire Insurance Company; The Hartford Insurance Company; Travelers Insurance Company; United States Fire Insurance Company; Underwriters at Lloyd's of London; Alliance Insurance Company, Ltd.; Andrew Weir Insurance Company, Ltd.; Bishopsgate Insurance Company,

* Amended as per the Clerk's 4/26/96 Order.

Ltd.; Drake Insurance Company, Ltd.; Edinburgh Assurance Company, Ltd.; English & American Insurance Company, Ltd.; Hansa Marine Insurance Company, Ltd.; Insurance Company of Ireland, Ltd.; Orion Insurance Company, Ltd.; Sphere Insurance Company, Ltd.; Threadneedle Insurance Company, Ltd.; Does; Bellefonte Insurance Company, Ltd., Intervenor–Defendants.

Ultramar America Limited, and Ultramar Petroleum, Inc., (collectively "Ultramar"), Appellants No. 96–5166.

The Pittston Company ("Pittston"), Appellant No. 96–5167.

Nos. 96–5166, 96–5167.

United States Court of Appeals, Third Circuit.

Argued March 10, 1997.

Decided Aug. 27, 1997.

John E. Heintz (argued), Christopher H. Marraro, Steven N. Gersten, Howrey & Simon, Washington, DC, John M. Angello, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Appellants in No. 96–5166, Ultramar America Limited and Ultramar Petroleum, Inc.

Robert N. Sayler (argued), William F. Greaney, Robert A. Long, Jr., Covington & Burling, Washington, DC, Timothy A. Vanderver, Jr., David J. Farber, Patton Boggs, L.L.P., Washington, DC, for Appellant in No. 96–5167, The Pittston Company.

William B. McGuire, John J. Henschel, Tompkins, McGuire & Wachenfeld, Newark, NJ, Donald T. Rave, Jr., George R. Daly, Stacey Tranchina, Bigham, Englar, Jones & Houston, New York City, for Allianz Insurance Company; Ancon Insurance Company; The Hartford Insurance Company; Chiyoda

**512**

Fire & Marine Insurance Company; Rochdale Insurance Company; Unigard Mutual Insurance Company; Unione Italiana; United Americas.

Wm. Gerald McElroy, Jr. (argued), Zelle & Larson, Waltham, MA, for American Marine Underwriters, Inc.; Employers Insurance Company of Wausau.

Martin R. Baach, Bruce R. Grace (argued), Nussbaum & Wald, Washington, DC, for IN-SCO; Sphere Drake Underwriters; Nippon Fire & Marine Insurance Company (U.K.) Limited; Skandia (UK) Insurance Company, Ltd., per Orion Insurance Company, PLC. Group; Switzerland American Insurance Company; British Reserve Insurance Company, Ltd. No. LA/C; National Insurance Company of New Zealand, Ltd.; Phoenix Assurance Company, Ltd.; Polaris–Norske SJO Insurance Company, Ltd.; Provincial Insurance Public Limited Company; Road Transport & General Insurance Company, Ltd.; Nippon Fire & Marine Insurance Company, Ltd.; Nippon Fire & Marine Insurance Company, Ltd. TLA/C.

Paul R. Koepff (argued), Paul M. Alfieri, O'Melveny & Myers, New York City, for Insurance Company of North America.

James A. Scarpone, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, Neal M. Glazer (argued), D'Amato & Lynch, New York City, Martin R. Baach, Bruce R. Grace, Nussbaum & Wald, Washington, DC, for Underwriters at Lloyd's of London; Bishopsgate Insurance Company; Insurance Company of Ireland; Threadneedle Insurance Company; Minister Insurance Company No. 3; Ocean Marine Insurance Company; Assicurzaioni Generali S.P.A.; British Law Insurance Company; Commercial Union Assurance Company, Ltd.; Excess Insurance Company, Ltd.; La Reunion Francaise S.A. D'Assurances; Northern Assurance Company, Ltd. Group; Scottish Lion Insurance Company, Ltd.; Andrew Weir Insurance Company, Ltd.; Minister Insurance Company, Ltd. No. 2A/C; Road Transport Insurance Company.

Joseph R. McDonough, Graham, Curtin & Sheridan, Morristown, NJ, for Yasuda Fire & Marine Company, (UK) Ltd.

Edward G. Madden, Jr., Mattson & Madden, Newark, NJ, for Protective Insurance Company.

Joseph L. Ruby, Wiley, Rein & Fielding, Washington, DC, for Travelers Indemnity Company.

Before: MANSMANN and LEWIS, Circuit Judges and DUPLANTIER,** District Judge.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

These related appeals involve a multi-party insurance dispute arising from a polluted oil transfer terminal, "Tankport," which sits on the western shore of upper New York Harbor in Jersey City, New Jersey. Appellants Ultramar America Limited and Ultramar Petroleum, Inc. (collectively "Ultramar") purchased Tankport from Appellant The Pittston Company ("Pittston"). As part of the purchase agreement, Pittston agreed to indemnify Ultramar for any environmental damage caused during Pittston's ownership of Tankport. Ultramar has since decommissioned Tankport and faces extensive environmental remediation costs. Although Ultramar and Pittston have settled the question of liability between them, they each seek relief from their respective insurance carriers. The district court granted summary judgment in favor of the insurers on all of Ultramar's claims and most of Pittston's claims.

On appeal, there are two primary questions before us. First, are Ultramar's and Pittston's claims for insurance coverage barred by the doctrine of known loss? Second, do Pittston's marine insurance policies preclude coverage for land-based pollution? We will conclude that both of the above questions should be answered in the negative. Accordingly, we will reverse.

** Honorable Adrian G. Duplantier, United States District Judge for the Eastern District of Louisiana, sitting by designation.

## I.

The factual background of this case is set out thoroughly in the district court's extensive opinion. *See Pittston Co. v. Allianz Ins. Co.*, 905 F.Supp. 1279 (D.N.J.1995). Here, we will repeat only those facts necessary to resolve these appeals.[1]

In 1954, Pittston purchased the facility now known as Tankport from Standard Oil Company. Standard Oil had operated the facility as part of its "Eagle Works" petroleum refinery, but the facility had not been operating since the 1930s. When Pittston acquired ownership of the facility, it renamed it "Tankport" and began to operate it as an oil storage and transfer facility. Oil was brought in by barge to an attached pier, pumped from the barges through pipelines, and stored in tanks on the property. The oil was then pumped from the tanks into tank trucks for delivery to customers.

Tankport is located on a very low piece of land, which at places, is within inches of or below the water table. A creek, known as Caven Creek, runs along one side of the property. As the district court stated, the very large volume of oil processed and transshipped through Tankport, combined with the "rudimentary or non-existent environmental safeguards that characterized the industry early this century" undoubtably caused "significant environmental degradation" prior to Pittston's purchase of the site. *Pittston*, 905 F.Supp. at 1289.

Beginning in 1961, Pittston purchased a series of Comprehensive General Liability ("CGL") policies from Travelers Indemnity Company that covered all of its operations, including Tankport. In 1971, the CGL policies began to include pollution exclusion clauses, which were standard practice in the insurance industry. Beginning in 1978, Pittston purchased a series of Comprehensive Marine Liability Package ("CMLP") policies from the Appellees Marine Insurers ("CMLP

Insurers").[2] The CMLP policies were terminated in 1984.

Pittston alleges that, throughout its tenure at Tankport, the site's oil tanks were subject to routine maintenance and cleaning. During that time, however, three major spills occurred. First, in 1976, a pipe coupling broke during the transfer of oil and 291,000 gallons spilled into a containment dike around a tank. Pittston notified federal and state officials, and Pittston officers testified that they cleaned up the spill and disposed of the contaminated soil. The second major spill occurred in 1980, when 200 gallons of oil spilled onto the ground. Pittston provided evidence that authorities were notified and that an outside contractor cleaned up the spill. Finally, sometime between 1981 and 1983, Pittston discovered that one tank was losing oil. After discovering the leak, Pittston apparently dug trenches to collect the oil and removed it by vacuum trucks, absorbent pads and oil booms. In addition, during the excavation to find the leak, workers discovered pipelines that had been abandoned by the former owner of the property. Pittston offered testimony to show that it had engaged in the appropriate remedial conduct, such as draining and removing the abandoned pipelines.

Importantly, Pittston maintains that although it was the subject of repeated inspection from regulatory authorities, no demand or claim was ever made on it involving environmental damage at Tankport, beyond the Coast Guard's issuance of "minor penalties" for accidental spills. By 1979, however, Pittston was sufficiently concerned about Tankport's future that it commissioned a pollution study from Environics, an environmental firm. That study confirmed that Tankport was "substantially contaminated with oil in excess of regulatory allowances." *Pittston*, 905 F.Supp. at 1291.

On April 30, 1983, Ultramar acquired Tankport through a stock purchase of Pitt-

---

1. There are four pending motions related to Pittston's appeal, No. 96-5167, which we will dispose of by separate order.

2. The CMLP Insurers are: Allianz Insurance Co.; American Marine Underwriters; Ancon Insurance Co.; Chiyoda Fire & Marine Insurance Co.;

Gibbs & Companies; Hartford Fire Insurance Co.; Lloyds Underwriters on FSJ–100–4/83; Rochdale Insurance Co.; Unigard Mutual Insurance Co.; Unione Italiana Reinsurance Co.; United Americas Insurance Co.; and Wausau. *Pittston*, 905 F.Supp. at 1289 n. 2.

ston Petroleum Company, a Pittston subsidiary. As part of the stock purchase agreement, Pittston agreed to indemnify Ultramar for any damages caused by the contamination of the Tankport site during Pittston's ownership of it. After acquiring Tankport, Ultramar also purchased its own CMLP policy, which named Pittston as an additional insured. This CMLP policy covered the period from April 30, 1983 to April 30, 1984.[3] In addition, Ultramar purchased two CGL policies issued by the Insurance Company of North America ("INA"), which covered the periods of June 30, 1982—June 30, 1983 and May 23, 1983—June 30, 1984.

Ultramar alleges that it had, at best, only sketchy and limited information of contamination at Tankport at the time the insurance policies were purchased. According to Ultramar, prior to purchasing Pittston Petroleum, its representatives made a brief visit to Tankport where they were told of a minor groundwater problem that Pittston was "taking care of." Ultramar claims it undertook no further environmental study of Tankport until after the insurance policies at issue were purchased.

Ultramar briefly operated a fuel storage terminal at Tankport and, in 1984–85, Ultramar commissioned an environmental study of Tankport by the Killam Company, an independent consultant. Ultramar closed the site for good in 1985 and filed a submission indicating its intent to decommission the site pursuant to the New Jersey Environmental Cleanup Responsibility Act ("ECRA").

Thereafter, the New Jersey Department of Environmental Protection (NJDEP) asserted claims against Ultramar for chromium contamination of the soil at Tankport. In 1988, Ultramar filed suit against Pittston under the stock purchase agreement's indemnifica-

tion provision. That suit has been settled and is not at issue here. But in August of 1989, Ultramar circulated a draft amended complaint in the chromium litigation alleging that Pittston was also liable to it for clean-up costs associated with petroleum contamination.

By letter dated April 4, 1990, Pittston notified Travelers, its CGL insurer, of Ultramar's claim and forwarded a proposed settlement agreement. The letter requested a quick decision on coverage because of pending motions in the Ultramar suit. On April 9, 1990, Pittston and Ultramar settled the claim, with Pittston agreeing to pay 80% and Ultramar agreeing to pay 20% of the total clean-up costs. Three days after the settlement, Travelers sent a letter waiving objection to the settlement but reserving its other rights to dispute coverage. Pittston's insurers then denied coverage.

On August 10, 1990, Pittston filed suit against its various insurers in New Jersey Superior Court for declaration of coverage. The insurers removed the case to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1441(d). Ultramar then joined the suit as a plaintiff-intervenor seeking declaration of coverage on its CMLP policy.[4] Pittston and Ultramar moved for summary judgment on the ground that the language of the CMLP policies provided coverage for the Tankport clean-up costs. All of the insurers moved for summary judgment on the ground that coverage was barred by the common law doctrine of "known loss." A total of sixteen motions were filed in all.

With regard to Pittston's claims, the district court granted summary judgment in favor of the CMLP Insurers.[5] The court held that the CMLP policies unambiguously

---

3. The policy was underwritten by Hartford Insurance Co., Wausau, and Underwriters at Lloyds of London.

4. Ultramar later filed an amended complaint-in-intervention asserting claims against INA, the carrier of its two CGL policies.

5. The court denied summary judgment with respect to most of the CGL policies covered by Travelers. *Pittston*, 905 F.Supp. at 1318. Although noting that coverage under any post-

1979 CGL policies would be barred by the doctrine of known loss, the district court did not certify as final those parts of its order relating to the Travelers policies. Thus, the issue of coverage under the CGL policies issued by Travelers is not before us. Our disposition of this appeal, however, will be relevant to those policies insofar as our holding adopts a broader version of the known loss doctrine than the district court adopted.

precluded coverage for Pittston's environmental liability arising out of contamination at Tankport.[6] Specifically, the court found that the CMLP policies covered only liabilities arising out of particular events, activities or business operations and, consequently, did not provide "stand alone" pollution coverage. Alternatively, the court indicated that, under New Jersey law, the known loss doctrine would bar coverage for any claims arising under Pittston's post–1979 policies—that is, any claims arising under policies purchased after Pittston received the Environics report.

With regard to Ultramar's claims, the district court granted summary judgment in favor of the insurers on the basis of the known loss doctrine. Although the district court refused to grant summary judgment on Ultramar's CMLP policy on the basis of the language of the policy, the district court concluded that coverage was nevertheless barred on the basis of known loss.[7] See Pittston, 905 F.Supp. at 1330 ("Ultramar cannot reasonabl[y] maintain that, in 1983, knowledge of extensive groundwater contamination of a site they were proposing to acquire would not result in liability for cleaning it up.").

On November 17, 1995, the district court denied Ultramar's and Pittston's motions for reconsideration.[8] On November 22, 1996, the district court certified as final the parts of the order relating to: (1) the dismissal Ultramar's claims against the CMLP Insurers and INA on the basis of known loss; and (2) the dismissal of Pittston's claims against the CMLP Insurers based on the language of the policies and, alternatively, on the basis of known loss.

Ultramar appeals the district court's finding that although Ultramar's policies may have provided coverage for environmental remediation, coverage was nonetheless barred by the known loss doctrine. Pittston appeals the district court's finding that Pittston's CMLP policies could not be interpreted, as a matter of law, to include coverage of strictly land-based activities. Pittston also appeals the district court's alternative "known loss" basis for granting summary judgment in favor of the CMLP Insurers.

The district court had jurisdiction pursuant to 28 U.S.C. § 1330 and § 1441(d). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

 Our review of a district court's grant of summary judgment is plenary. Oritani Sav. & Loan Assoc. v. Fidelity & Deposit Co. of Md., 989 F.2d 635, 637 (3d Cir.1993). Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making this determination, we must consider the evidence in the record in a light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 Moreover, we have plenary review over a district court's interpretation of state law, Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976, 983 (3d Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996), as well as its conclusion as to the legal operation of an insurance policy. New Castle County v. Hartford Accident & Indem. Co., 933 F.2d

---

**6.** Although the CMLP Insurers did not move for summary judgment based on the language of the policies, the district court entered summary judgment sua sponte on this basis.

**7.** In refusing to grant summary judgment against Ultramar on the basis of the CMLP policy language, the court noted that "[t]he same rationale that supports the ruling [with regard to Pittston's CMLP policies], the placement of the pollution clause in the contract, supports the insured's contention that moving the pollution clause to the specific terms and conditions part means that

it was considered to provide stand-alone coverage." Pittston, 905 F.Supp. at 1326–27.

**8.** In its motion for reconsideration, Pittston argued for the first time that coverage was provided under the "terminal operators" provision of its CMLP policies. The district court rejected the argument, finding that "it adequately addressed and disposed of the issue on summary judgment." Pittston, No. 90–3631, slip op. at 5 (order denying motion for reconsideration). Pittston raises that argument again on appeal.

1162, 1183 (3d Cir.1991). The district court determined, and the parties do not dispute, that New Jersey law applies to this case. *See Pittston Co. v. Allianz Ins. Co.*, 795 F.Supp. 678 (D.N.J.1992). As such, we must apply the substantive law of New Jersey. *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 613 (3d Cir.1992).

## III.

### A. *Are Ultramar's Claims Barred Under the "Known Loss" Doctrine?*

■ The known loss doctrine is a common law concept that derives from the fundamental requirement of fortuity in insurance law.[9] Essentially, the doctrine provides that one may not obtain insurance for a loss that either has already taken place or is in progress. *See generally* 12 John A. & Jean Appleman, *Insurance Law & Practice* § 7001 (rev. ed.1981). As we have recognized, "[t]he rule is based on the realization that the purpose of insurance is to protect insureds against unknown risks." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982) (citations omitted). State courts are divided as to the scope of the known loss doctrine. Some have construed it quite narrowly, barring coverage only when the insured knew of certainty of damages and liability. *See Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal. Rptr.2d 324, 913 P.2d 878, 906 (1995) (en banc) ("[A]s long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of liability ... and no legal obligation to pay third party claims has been established, there is a potentially insurable risk....."). Others have refused to find coverage when the insured was substantially aware of a risk of loss. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210 (1992) ("If the insured knows or has reason to know,

when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss.").

■ Unfortunately, we do not know how broadly or narrowly the New Jersey Supreme Court would construe the doctrine because it has not yet resolved this issue. Accordingly, we must do our best to predict how it would do so. *New Castle County*, 933 F.2d at 1168. We are not completely without guidance, however, for we must "give due consideration to the decisional law of inferior state courts." *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 435 n. 11 (3d Cir.1992). While we are not bound by lower state courts, "[a] decision of 'an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.* (quoting *West v. American Telephone & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)).

With that in mind, we will start by discussing *Astro Pak Corp. v. Fireman's Fund Ins. Co.*, 284 N.J.Super. 491, 665 A.2d 1113, *cert. denied*, 143 N.J. 323, 670 A.2d 1065 (1995), the leading case in New Jersey to apply the doctrine of known loss. *Astro Pak* involved a declaratory judgment action brought by Astro Pak Corporation against its CGL insurers. Astro Pak's insurance policies covered the periods of 1974 through 1976 and 1976 through 1984. Between 1973 and 1976, Astro Pak had discharged waste, chemicals and solvents in the Kin–Buc landfill, which was owned and operated by Transtech Industries. In 1976, the Kin–Buc landfill was closed by the New Jersey Department of Environmental Protection due to extensive groundwater contamination. After receiving notification that the landfill had been closed, Astro Pak

---

**9.** The known loss doctrine has a few variants, often referred to as the doctrines of "known risk" or "loss in progress." In addition, it appears that those terms are often conflated or used interchangeably. *See, e.g., City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir.1989) (discussing doctrine of "known risk"); *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.*, 997 F.2d 172 (6th Cir.1993) (describing "loss in progress" as variant of the "known loss" doctrine). To simplify our analysis, we agree with the district court that "known loss" best describes the doctrine at issue here, and we will use that term throughout our discussion.

immediately ceased deliveries of waste to the site. In 1979, the United States sued Kin–Buc, Transtech and others for the recovery of remediation costs, and in 1983 it ordered eleven parties to remediate the site. Astro Pak was not a party to either proceeding. In 1984, however, the EPA informed Astro Pak that it was potentially liable for clean-up costs under CERCLA.

In 1990, Transtech sued Astro Pak and others, seeking recovery for past and future remediation costs. Astro Pak then sought coverage from its CGL insurers. The insurers argued that coverage was precluded by the known loss doctrine and the loss in progress doctrine.

The court began its analysis by noting that "no New Jersey opinion has applied either doctrine by name," but that "federal cases and out-of-state cases recognize the doctrines and even state that the doctrines are applied in New Jersey in principle." *Astro Pak Corp.*, 665 A.2d at 1116. After recognizing that "[t]he doctrines have their roots in fraud," the court concluded that the known loss doctrine did not negate coverage for pollution from the defective landfill, even though Astro Pak had deposited such materials in the landfill before the policies took effect. *Id.* The court reasoned that:

> If the prevention of fraud is at the heart of these rules, the "loss" must relate to a known occurrence that would trigger indemnification by the insurer. Only if [Astro Pak] knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense.... The loss was still fortuitous here in that Astro Pak had not been aware of its own potential liability when the [insurance] policies were written.

*Id.* at 1116–17. Thus, Astro Pak's awareness that the landfill was closed due to possible contamination was not sufficient to create a presumption of actual or constructive knowl-

edge of its potential liability. *Id.* at 1117 ("It was not until years later that there was any liability claimed against Astro Pak such as this claim.... The fact that Astro Pak was aware that Kin–Buc was closed due to possible contamination in July 1976 does not equate with Astro Pak's actual or constructive knowledge of an insured claim against Astro Pak."). Finally, the court stressed that the statute on which the underlying liability was based (CERCLA) had not yet been enacted and "Astro Pak was not even a named defendant" in the underlying legal action brought by the government. *Id.*

Both Ultramar and its insurers insist that *Astro Pak* supports their respective theories of the known loss doctrine. Ultramar contends that, under *Astro Pak*, the known loss doctrine does not apply "unless the insured knew that its acts had already subjected it to liability at the time it purchased the insurance policies." Moreover, relying on *Astro Pak*, Ultramar argues that "there can be no known loss where the basis for the underlying liability was a statute enacted after the policy period had begun."

The insurers challenge this reading as unduly narrow, and counter that, by its express terms, *Astro Pak* requires knowledge of *potential* liability only, not actual liability. Thus, according to the insurers, *Astro Pak* cannot be read to require knowledge of the precise legal bases for liability in order for the known loss doctrine to apply. The insurers argue that, here, Ultramar knew that Tankport was contaminated before it acquired the facility and before it purchased the insurance policies. It follows, they claim, that Ultramar's knowledge of Tankport's contamination constituted knowledge of a known loss.[10]

The district court agreed with the insurers, holding that coverage was barred by the doctrine of known loss. Rejecting Ultramar's contention that notice of legal liability

**10.** Appellees Century Indemnity Company and INA argue, alternatively, that the district court's judgment should be affirmed based on the "absolute pollution exclusion" contained in one of its policies in effect from June 30, 1982 to June 30, 1983. Because the district court granted the insurers' summary judgment motion on the basis

of known loss, it denied the motion based on the "absolute pollution exclusion" as moot. We will reverse the judgment of the district court on the basis of known loss. We will leave it to the district court to address on remand the "absolute pollution exclusion."

was required to trigger the known loss doctrine, the court stated:

> While it is obvious that receipt of formal notice of legal liability for environmental damage would provide powerful, and possibly dispositive evidence of knowledge of the loss, it does not follow that this is the only way knowledge of the loss may be acquired. Cases that hold that the commencement of litigation means that the loss is known do not compel the conclusion that the loss may not become known earlier.

*Pittston,* 905 F.Supp. at 1330. Thus, the court concluded that Ultramar did not need to have knowledge of legal liability for the known loss doctrine to bar coverage. The court distinguished *Astro Pak* by noting that:

> [A] polluter who believes it is disposing of waste properly, only to become subject to liability pursuant to a later change in the law that dramatically extends the circle of responsibility, *see, e.g., Astro Pak,* might not have notice of the loss until formal notice was received.

*Id.*

We disagree with the district court's interpretation of *Astro Pak.* In our view, *Astro Pak* supports Ultramar's theory of the known loss doctrine—that certainty of legal liability, rather than certainty of damage, is required to trigger application of the doctrine. We reach this conclusion despite the fact that *Astro Pak* indicated that "knowledge of potential liability because of leakage into the surrounding land, water or air" might allow the insurers to assert the known loss defense. *Astro Pak,* 665 A.2d at 1116. In our view, this isolated passage cannot be read for the broad proposition that the district court adopted. The *Astro Pak* court explicitly rejected the view that knowledge of possible contamination equates with knowledge of an insured claim. *See id.* at 1117. ("The fact that Astro Pak was aware that Kin–Buc was closed due to possible contamination in July 1976 does not equate with Astro Pak's actual or constructive knowledge of an insured claim against Astro Pak."). Moreover, the court stressed that the underlying basis for liability, CERCLA, had not

yet been enacted at the time the policies were issued. *Id.*

Here, the district court equated Ultramar's knowledge of the extensive contamination at Tankport with knowledge of a known loss. While we recognize the allure of the district court's "common sense observation" that "some harm so clearly will result in legal liability that knowledge of the harm may be presumed to constitute knowledge of the insured liability," *Pittston,* 905 F.Supp. at 1330, we are hesitant, as a court sitting in diversity, to broaden the application of the known loss doctrine. *See City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1153 (2d Cir.1989) (refusing to adopt the "known risk" theory for fear of adopting "innovative theories that may distort established state law"). Nor are we convinced, as the insurers vigorously argue, that a broad version of the known loss doctrine has been adopted by New Jersey courts. The primary cases cited by the insurers are unpublished trial court dispositions, which preceded *Astro Pak.* We should not defer to these decisions, especially where, as here, intermediate appellate court authority implies a narrower reading of the doctrine.

■ We think the better rule, and the one likely to be adopted by the New Jersey Supreme Court, is that the known loss doctrine will bar coverage only when the legal liability of the insured is a certainty. Thus, we adopt the rule set forth by the Supreme Court of California that the known loss doctrine "will not defeat coverage for a claimed loss where it had yet to be established, at the time the insurer entered into the contract of insurance with the policyholder, that the insured had a legal obligation to pay damages to a third party in connection with a loss." *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 906 (1995) (en banc). This rule does not undermine the basic concept of fortuity because, in the third-party liability context, the insurable risk is the uncertainty of liability. *See Stonewall Ins. Co. v. Asbestos Claims Management Corp.,* 73 F.3d 1178, 1215 (2d Cir.1995) (rejecting insurers' known loss defense even though insured was aware prior to the inception of the policies of poten-

tial liability, because "it was highly uncertain ... as to the prospective number of injuries, the number of claims, the likelihood of successful claims, and the amount of ultimate losses it would be called upon to pay"); *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F.Supp. 362, 376 (D.N.J.1995) (applying Pennsylvania law) ("[T]he occurrence of an event ... does not destroy the requisite element of statistical uncertainty in the third party liability context, as the relevant events remain to be determined, including: is there any harm to off-site locations; will claims be filed at all; what number of claims will be filed; what sums of money will the claims demand.").

Moreover, we note that this narrow interpretation of the known loss rule would avoid the problem identified by the Second Circuit in *City of Johnstown, NY*, 877 F.2d 1146. There, in refusing to apply a broad version of the known loss doctrine, the court noted that "to do so might well swallow up the more narrow doctrines regarding (1) concealment and misrepresentation and (2) damages that are 'expected' or 'intended' by the insured." *Id.* at 1153. *See generally UTI Corp.*, 896 F.Supp. at 374 (noting that known loss is "a defense grounded in policy considerations" ... and not a situation where "the insurer has alleged fraud on the part of the insured in the application process"); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 737 (Minn.1997) (noting that known loss, as a fraud-based defense, "requires proof that the insured withheld material information concerning the existence of property damage, including the initiation or continuation of soil or groundwater contamination, for which the insured subsequently obtained insurance").

■ Applying this theory of the known loss doctrine to Ultramar's claim, we conclude that the doctrine will not bar coverage under either its CGL or CMLP policies. Ultramar did not receive notice of any legal liability until December of 1989, some six years after it purchased the insurance policies. Moreover, the statute pursuant to which liability was imposed, ECRA, was not enacted until after the policies were issued. Finally, the insurers have not alleged that Ultramar misrepresented or wrongfully withheld information regarding the condition of the Tankport site. As such, we hold that Ultramar had a legitimate insurable risk and, thus, coverage is not barred by the doctrine of known loss.[11]

**B. Does the Architecture of Pittston's CMLP Policies Preclude Coverage for Contamination at Tankport?**

Pittston contends that the plain language of the CMLP policies covers Pittston's environmental liability to Ultramar arising out of contamination at Tankport. Specifically, Pittston alleges that two sections of the policies insure this liability: Part One, Section Two, and the "Terminal Operators" provision in Part Two, Section B.[12]

All of the marine policies are structured in two parts, as follows:

*Part I* General Policy Terms and Conditions and Insuring Agreements

*Part II* Specific Policy Terms and Conditions and Insuring Agreements relative to:

A) Charterer's Liability

B) Wharfinger's Liability

**11.** Because of our disposition of the known loss issue, we need not reach Ultramar's alternative claim that the district court improperly drew inferences in favor of the insurers when making the factual determination that Ultramar knew of extensive petroleum contamination at Tankport prior to the inception of the insurance policies.

**12.** As noted earlier, *see supra* note 8, Pittston did not argue that it was covered under the "terminal operators" provision of the insurance contract until it filed its Rule 59(e) motion for reconsideration. The district court rejected the argument summarily, assuring Pittston that it had adequately considered any possible claims for coverage under the CMLP policies on sum-

mary judgment. *See Pittston*, No. 90–3631, slip op. at 5 (order denying motion for reconsideration).

As we have noted, "[c]ourts often take a dim view of issues raised for the first time in post-judgment motions." *Kiewit Eastern. Co., Inc. v. L & R Const. Co. Inc.*, 44 F.3d 1194, 1204 (3d Cir.1995). We take such a dim view here and, thus, decline to consider Pittston's "terminal operators" argument on appeal. *See Weihaupt v. American Med. Assoc.*, 874 F.2d 419, 425 (7th Cir.1989) (refusing to consider on appeal an issue that was first raised by appellant in a Rule 59(e) motion).

C) Cargo Liability

D) Coverage on Owned Barges[13]

Vol. 1.App. at 50.

Of primary importance in this appeal is Section Two of Part One, which provides in pertinent part:

> This Policy is to cover any loss, damage liability and/or expense that the assured shall be liable to pay ... arising out of, or in consequence of, the actual and/or potential discharge, emission, spillage, or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

Vol. 1 App. at 51. This provision is limited to exclude loss arising from five contingencies, including war, and any acts of willful negligence or misconduct. Vol. 1 App. at 52.

Pittston argues that "the language of Part One, Section Two, standing alone, is broad enough to cover Pittston's environmental liability to Ultramar." Thus, according to Pittston, the district court's reading of this provision is contrary to its plain meaning. In contrast, the district court held, *sua sponte*, that Part One, Section Two does not contain any grants of coverage, but only "defines the type and extent of coverage granted in" Part Two.[14] *Pittston*, 905 F.Supp. at 1326. Thus, the court concluded:

> After a close reading of the plain language of the policies, consideration of their structure as a whole, and application of well-established rules of contract interpretation, the Court finds that the agreements are not ambiguous and that section two of part one clearly does not provide stand-alone pollution coverage.

*Id.* at 1319.

As the district court properly noted, the first step in examining an insurance contract is determining whether ambiguity exists. *Oritani Sav. & Loan Assoc. v.*

*Fidelity & Deposit Co. of Md.*, 989 F.2d 635, 637–38 (3d Cir.1993). This determination is a question of law for the court. *International Union, United Auto. v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir.1990). But "[w]hen the terms of an insurance contract are clear, ... it is the function of a court to enforce it as written and not make a better contract for either of the parties." *State v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932 (1992) (citation omitted). Thus, as we have explained, a court must not "torture" the language of a contract to create ambiguity where none exists. *Pennbarr Corp. v. Insurance Co. of N. Am.*, 976 F.2d 145, 151 (3d Cir.1992); *see also Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 582 A.2d 1257, 1260 (1990) ("[T]he words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability."). Further, in establishing ambiguity, the insured must do more than suggest a possible alternative reading of the contract; it must also offer an "objectively reasonable reading of the disputed passage." *New Castle County*, 933 F.2d at 1182. Under New Jersey law, ambiguity exists if "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 405 A.2d 788, 795 (1979).

The focus on ambiguity in insurance contracts arises from the doctrine of *contra proferentum*. Under New Jersey law, *contra proferentum* requires any ambiguities in an insurance contract to be resolved in favor of the insured. *See generally Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 161 A.2d 717 (1960). The policy rationale underlying strict application of the doctrine is that because most insurance agreements are drafted by the insurance industry, they are essentially contracts of adhesion. *Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 503 A.2d 862,

---

**13.** Later policies add two subsections to Part Two: E) Bailee and Warehousemen's Liability; and F) Open Cargo. *See* Vol. 19 Me. 141, 1 App. at 75, 107, 143.

**14.** The court acknowledged that it was "aware that only the insureds have moved for summary judgment on this issue," but entered summary

judgment for the insurers anyway because it was "already engaged in the task of determining whether there is an issue of fact" and "both parties ... had the opportunity to set forth their evidence on the issue." *Pittston*, 905 F.Supp. at 1326.

869 (1986). In other words, because insurance contracts are in most instances "nonnegotiable," it is not unfair that the insurer "bear the burden of any resulting confusion." *Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir.1947).

The doctrine of *contra proferentum* is not without its limits, however, and its application to sophisticated insureds has been called into question. *Compare Owens–Illinois, Inc. v. United Ins. Co.,* 264 N.J.Super. 460, 625 A.2d 1, 15 (1993) ("The principles favoring the interests of the insured are less persuasive in the context of a large skilled corporation."), *rev'd on other grounds,* 138 N.J. 437, 650 A.2d 974 (1994), *with CPS Chemical Co. v. Continental Ins. Co.,* 222 N.J.Super. 175, 536 A.2d 311, 318 (1988) ("These principles [of interpretation] are no less applicable merely because the insured is itself a corporate giant."). In *New Castle County,* we applied the doctrine of *contra proferentum* to a sophisticated insured under Delaware law. 933 F.2d at 1189. But our rationale was driven by the fact that the policy in question was drafted by the insurance company. *Id.* ("[W]e can conceive of no compelling reason why even a sophisticated insured should not be entitled to a pro-coverage interpretation of a standardized ... policy *drafted by the insurance industry.*") (emphasis added); *see also CPS Chemical Co.,* 536 A.2d at 318 (noting that "[t]he critical fact [in applying the doctrine is] that the ambiguity was caused by language selected by the insurer"). Moreover, in *Owens–Illinois, Inc.,* the court held that only "where it is clear that an insurance policy was 'actually negotiated or jointly drafted,' and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked." 625 A.2d at 15 (quoting *AIU Ins. Co. v. FMC Corp.,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1265 (1990)). Although that case was reversed on other grounds by the New Jersey Supreme Court, the supreme court cited with approval the language holding that "a sophisticated insured ... cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer." *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 991 (N.J.1994) (quoting *Owens–Illinois, Inc.,* 625 A.2d at 15).

■ Read in conjunction, these cases indicate that the dispositive question is not merely whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured. In such instances, we conclude that the doctrine of *contra proferentum* should not be invoked to inure to the benefit of the insured.

■ Here, it is undisputed that Pittston hired an insurance broker, Sedgewick James of New York, to secure marine insurance. The broker testified in his deposition that he prepared the initial draft of the policies and negotiated the terms with the insurers. *See* Supp.App. at 310–12. As such, we conclude that the CMLP policies were not contracts of adhesion and are more properly treated as traditional, jointly-negotiated contracts. *Accord Oritani Sav. & Loan Assoc.,* 989 F.2d at 642–43 (declining to construe an insurance policy in favor of a "sophisticated and powerful insured[ ] who ha[d] significant bargaining power and expertise in drafting insurance contracts"); *American Cas. Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396 (D.N.J.1993) ("[T]he insurance policies of large corporations are to be construed like any other contract."), *aff'd,* 17 F.3d 62 (3d Cir.1994). Thus, Pittston, as a sophisticated insured who was heavily involved in the drafting and negotiating of the policies, cannot benefit from the general rule favoring coverage, and we will not apply it here.

■ This is not to say, however, that the threshold issue of whether the policies are ambiguous is unimportant. On the contrary, "[w]hen resolving a contract dispute, the initial determination is whether the contract is ambiguous...." *Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996). In making that determination, we must decide whether " 'the contract is susceptible of more than one meaning.' " *Id.* (quoting *Briggs v. United Shoe Mach. Corp.,* 92 N.J. Eq. 277, 114 A. 538, 542 (Err. & App.1920)).

Pittston argues that the language in Part One, Section Two of the CMLP policies unambiguously grants broad, stand-alone coverage for pollution liability. Alternatively, Pittston urges that its interpretation of the policies is at least reasonable, which is sufficient to establish ambiguity. The CMLP Insurers argue that Part One, Section Two of the marine policies unambiguously does not provide an independent grant of coverage. The CMLP Insurers claim that Section Two, the "Specific Policy Terms" section is the only section that provides grants of coverage. The district court agreed with the CMLP Insurers, holding that "section two of part one clearly does not provide stand-alone pollution coverage." *Pittston*, 905 F.Supp. at 1319.

Although we agree with the district court that the "architecture" of the policies can be read to preclude stand-alone coverage, we also find it reasonable to interpret the language in part two of section one as granting such coverage. Thus, as will be explained further below, we conclude that the CMLP policies are ambiguous.

By its express terms, the language in Part One, Section Two grants coverage for "*any* loss, damage, liability and/or expense" incurred by Pittston because of the discharge of petroleum. Thus, according to Pittston, it does not provide coverage only for "any loss covered under Part Two" as the district court concluded. Moreover, Pittston argues, Part One, Section Two "does not have to be read in conjunction with the provisions of Part Two in order to have meaning: by its terms, it grants broad pollution coverage and sets out narrow exclusions from that coverage."

We agree. While the district court states that it closely examined the plain language of the policies, the court did not indicate what if any "language" in the provision indicates that coverage under that section is limited to insuring the liabilities arising under the grants of coverage specified in Part Two of the policy. The omission of such language is significant, we think, because other provisions in Part One do contain limiting language. For example, Part One, Section Three provides: "Coverage *hereunder includes* legal fees and associated expenses *in*

the defense of any claim that might be made hereon.*" Vol. 1 App. at 52 (emphasis added). Thus, Section Three, by its express terms, refers only to defense costs that arise out of a claim under some other section of the policy. In addition, Part One, Section One contains the qualifying phrase, "subject to the conditions of this policy," which also links that section to other parts of the policy. By contrast, Section Two has no express link.

We recognize that the district court used similar reasoning to come to the opposite conclusion. *See Pittston*, 905 F.Supp. at 1321 ("The architecture of the policies strongly suggests that the 'package' of covered risks was embodied in part two, and that, to continue the metaphor, part one was merely the string that tied the bundle together."). In our view, however, this recognition only reinforces our conclusion that the policies are ambiguous. We see no reason why the "architecture" of the policies, by itself, should override the express language, which appears to grant coverage. After examining the policies, we find it plausible that Part One could contain general terms relating to the policy as a whole, as well as substantive grants of coverage.

The table of contents to the policies also lends support for Pittston's interpretation. The titles of both Part One and Part Two contain the term "Insuring Agreements." We agree with Pittston that the term "Insuring Agreements" implies coverage. As such, Pittston's contention that, on its face, Part One contains both general conditions and grants of coverage is reasonable.

In determining that none of the provisions in Part One provided stand-alone coverage, the district court also relied on the policy's preamble, which states: "Unless otherwise specified, the following terms and conditions are incorporated under all sections of the policy." *Pittston*, 905 F.Supp. at 1321. Although recognizing that "the preamble does not directly negate the proposition that the general provisions provide independent coverage too," the court applied the maxim *expressio unius exclusio alterius* and concluded that "where it is specified that the general provisions are to be incorporated into the specific ones, the clear implication is that the

general provisions do not grant coverage on their own." *Id.*

While we do not gainsay the district court's conclusion that *expressio unius* can aid in contract interpretation, we agree with Pittston that the principle of *expressio unius* is not violated by affording the language of the preamble *its most natural meaning.* In our view, the most natural meaning of the language "under all·sections of this policy" is that the "terms and conditions" are incorporated under "all sections"—that is, all sections of Parts One and Two—rather than solely under "all sections of Part Two." This interpretation of the preamble would provide for all general "terms and conditions" to apply to all grants of coverage in Part One and Part Two.

Beyond its reliance on the language and architecture of the policies, the district court looked to extrinsic evidence to support its conclusion that the policies did not provide stand-alone pollution coverage. We have noted that "extrinsic evidence of the negotiations, conduct and other circumstances of the parties is important to a court's analysis of whether an agreement is ambiguous only to the extent, if any, that such evidence provides 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are ·susceptible of different meanings.'" *American Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir.1995). After independently reviewing the extrinsic evidence here, we find that it does little to clear-up the ambiguity.

Accordingly, while we acknowledge that the court's construction of the contract is reasonable, we conclude that Pittston's construction is reasonable as well. Thus, Pittston has established that the policies are ambiguous. As such, the district court's entry of summary judgment, *sua sponte,* in favor of the insurers was inappropriate. *See Sumitomo Mach. Corp. of Amer., Inc.*, 81 F.3d at 335 ("When a contract is ambiguous, the 'fact-finder must attempt to discover what the contracting parties ... intended[the disputed provisions] to mean.' ") (quoting *Teamsters Indus. Emp. Welfare Fund v. Rolls–Royce*, 989 F.2d 132, 136 (3d Cir. 1993)); *In re Newport Plaza Assocs.*, 985 F.2d 640, 644 (1st Cir.1993) (stating that "the interpretation of [ambiguous] contract language, itself acknowledged, becomes a question of fact for the jury rather than a question of law for the judge"); *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987) (explaining that when the "plain meaning of a contract phrase does not spring unambiguously from the page or from the context, its proper direction becomes one for the factfinder, who must ferret out the intent of the parties"). Accordingly, we will reverse the order of the district court and remand for trial on the question of whether the CMLP policies provide coverage for Pittston's liability to Ultramar.

### C. Are Pittston's Claims Barred by the "Known Loss" Doctrine?

In addition to holding that the CMLP policies do not provide coverage for remediation of Tankport, the district court stated: "For the reasons discussed below, the known loss theory would provide an alternative ground for dismissing the case against Pittston's marine insurers." *Pittston,* 905 F.Supp. at 1327. In deciding the insurers' motion for summary judgment, the district court determined that the pre–1979 evidence was not as conclusive as to Pittston's knowledge of the environmental damage at Tankport as the post–1979 Environics report evidence. *See id.* at 1310. Thus, the court granted summary judgment to the insurers for coverage after the 1979 Environics report based on the known loss doctrine but refrained from granting summary judgment to the insurers for coverage prior to 1979 (which dated back to 1961). The court explained: "The evidence that Pittston expected contamination as of the late seventies does not justify summary judgment that the insured's activities should have led it to expect or intend off-site or groundwater damage before that period." *Id.* at 1310.

We need not discuss Pittston's known loss . argument, other than to say that for the reasons discussed above in part III.A., relating to the application of known loss to Ultramar's claims, we conclude that the CMLP Insurers cannot assert the known loss doctrine against Pittston. It is undisputed that

no claims were made against Pittston until six years after the expiration of the last policy, when Ultramar sought indemnification pursuant to the stock purchase agreement. Pittston thus had no knowledge of legal liability when it purchased the policies. As such, the known loss rule as we have construed it does not bar potential coverage under the CMLP policies.

## IV.

For the foregoing reasons, we reverse the district court's order granting summary judgment in favor of the CMLP Insurers and INA with respect to Ultramar's claims on the basis of known loss. We also reverse the district court's order granting summary judgment in favor of the CMLP Insurers with respect to Pittston's claims on the basis of the policy language and the basis of known loss. On remand, the district court should allow the question of whether the CMLP policies provide pollution coverage to proceed to trial.