# FOR PUBLICATION



FILED
Jun 04 2014, 10:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GINNY L. PETERSON**
Kightlinger & Gray, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE PATRICIA
KOPETSKY:

**W. BRENT THRELKELD**
**BENJAMIN G. STEVENSON**
Threlkeld & Associates
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE KB HOME
INDIANA INC.:

**PETER J. RUSTHOVEN**
**E. SEAN GRIGGS**
**DAVID M. HEGER**
Barnes & Thornburg LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| INDIANA INSURANCE COMPANY, | ) | |
| | ) | |
| Appellant/Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1304-PL-340 |
| | ) | |
| PATRICIA KOPETSKY, | ) | |
| | ) | |
| Appellee/Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KB HOME INDIANA INC., | ) | |
| | ) | |
| Appellee/Defendant. | ) | |

**June 4, 2014**

**OPINION – FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

In 1998, Appellee/Defendant KB Home Indiana Inc., f/k/a Durabuilders, Inc. ("KB Home") entered into an agreement ("the Agreement") to purchase lots from Appellee/Defendant/Counterclaim Plaintiff Patricia Kopetsky's late husband George Kopetsky in Cedar Park, a housing development being developed by George.[1] In the Agreement, George represented that he was unaware of any contamination in Cedar Park at the time of the Agreement's execution. Additionally, George indicated that at each lot closing, he would certify that he had not received any notice from any governmental agency or private person concerning the existence of any toxic or hazardous waste on that lot. After purchasing over sixty lots from George, KB Home became aware that some of the lots it had purchased contained contaminants. In 2007, KB Home filed suit against George and other defendants, alleging that George knew of possible contamination in the Cedar Park lots as early as April of 2002, he was negligent in failing to notify KB Home of potential

---

[1] Although the Agreement lists George and Patricia collectively as "Developer[,]" Appellant's App. p. 704, Patricia did not sign the Agreement, and there is nothing in the record to suggest that she had any active involvement in the development of Cedar Park. As such, for purposes of relating the underlying facts of this case, we shall treat the Agreement as having been entered into with George alone.

environmental issues, he breached the Agreement by violating the requirement that he inform KB Home if he received notice concerning the presence of toxic waste, and he committed constructive fraud on KB Home.

In April of 2009, Appellant/Plaintiff/Counterclaim Defendant Indiana Insurance Company, who at relevant times had been George's commercial general liability ("CGL") insurance carrier, filed a declaratory judgment action against George and KB Home, asking for a declaration that it had no duty to defend and/or indemnify George in KB Home's suit against him. George filed a counterclaim against Indiana Insurance, alleging that it had breached its insurance contracts ("the Policies") with George in bad faith. In 2010, George passed away, and Patricia was substituted as a defendant and counterclaim plaintiff. Ultimately, the trial court granted summary judgment in favor of Patricia on the coverage question but dismissed her bad faith counterclaim. Indiana Insurance contends that the trial court erred in granting Patricia summary judgment because (1) no damages were alleged by KB Home that qualify as "property damage" under the Policies; (2) the damages alleged were not the result of an "occurrence" under the Policies; (3) the Policies' "expected and intended" exclusion barred coverage; (4) the Policies' "contractual liability" exclusion barred coverage; (5) the "known loss" doctrine barred coverage; (6) Patricia was not properly substituted for George in the underlying lawsuit as counterclaim plaintiff; and (7) the trial court erred in concluding that Indiana Insurance would have to indemnify Patricia for any judgment rendered in KB Home's favor. Patricia cross-appeals, claiming that the trial court erred in dismissing her bad faith claim against Indiana Insurance. Concluding that there is a genuine

3

issue of material fact as to whether the known loss doctrine bars coverage and that the question of whether Indiana Insurance is obligated to indemnify Patricia is not yet ripe for adjudication, we affirm the judgment of the trial court in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

### A. The Agreement

On November 17, 1998, KB Home and George entered into the Agreement, which applied to the sale of residential lots in Cedar Park from George to KB Home. Cedar Park is divided into three sections: Section 1 (fifty-seven lots) on the eastern edge, Section 2 (seventy-five lots) in the middle, and Section 3 (seventy-one lots) on the western edge. The Agreement provided, generally, that George would have completed certain infrastructure improvements to Section 1 by August 15, 1998, and would have made the lots available to KB Home for construction. Individual lots would be purchased by KB Home, who would then construct residences on them for sale. Assuming that development continued as contemplated in the Agreement, Section 1 would be developed first, followed by Section 2 and then Section 3.

The Agreement includes the following provision regarding disclosure of possible contamination in any part of Cedar Park at the time of the Agreement's execution:

> 5.2 [George's] **Environmental Representation**. [George] has previously provided [KB Home] with a copy of all environmental assessments with respect to [Cedar Park] or any portion of which [George] is aware of. With respect to any assessment obtained or paid for by [George] or any of its principals, its affiliates or related persons or entities, [George] shall cause the party who prepared the Assessment to address it to [KB Home] and to

4

specifically state that [KB Home] may rely upon the assessment. Except as may be otherwise disclosed in such Assessments, [George] represents and warrants to [KB Home] that to [George's] knowledge, (i) no portion of [Cedar Park] has been used for any activity involving the use, generation, treatment, release, storage or disposal of any hazardous material, waste or substance or toxic substance or petroleum or PCBs (collectively, "Hazardous Materials") and [Cedar Park] is free of any Hazardous Materials and [Cedar Park] is not in violation of any Rules governing any type of Hazardous Materials, (ii) no portion of [Cedar Park] is subject to the Indiana Responsible Property Transfer Law, Indiana Code 13-7-22.5 et seq. and no disclosure document is required thereunder and (iii) there has not been there are no underground storage tanks on or under [Cedar Park] and there is no reason to believe or be put on inquiry that any of such matters are not true.

Appellant's App. p. 710.

The Agreement also includes the following provision regarding the disclosure of possible contamination in any given lot sold to KB Home over the life of the Agreement:

4.3.9 [George] has not received any notice from any governmental authority or private citizen concerning the existence or possible existence of any toxic or hazardous or regulated waste, material or substance and all utility lines are available to directly connect to mains located in public thoroughfares or over property for which there is a perpetual and adequate easement and no private person, firm or corporation has the right to terminate or impede said utility services to the Lots and [Cedar Park].

Appellant's App. p. 709.

The Agreement provided, *inter alia*, that George would provide the following at the closing of each individual lot sale:

A certification by [George] that no Disclosure Statement needs to be delivered under the Indiana Responsible Property Transfer Law in connection with the Lot and that Items 4.3.1 through 4.3.10 continue to be satisfied.

Appellant's App. p. 714.

On December 30, 2002, George and KB Home agreed to an amendment to the

5

Agreement which stated that "[a]ll other terms and conditions of the Agreement as originally executed shall remain in full force and effect." Appellant's App. p. 693.

## B. The Policies

Indiana Insurance issued the Policies, which were four CGL policies effective from April 29, 2002, to April 29, 2006, to OK Sand & Gravel Co., Inc., under which George qualifies as a named insured. The Policies contain the following relevant language:

> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
> 1.     Insuring Agreement
>     a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> ....
>     b.     This insurance applies to "bodily injury" and "property damage" only if:
>     (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."
>     (2)     The "bodily injury" or "property damage" occurs during the policy period; and
>     (3)     Prior to the policy period, no insured … and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.
>     c.     "Bodily injury" or "property damage" which occurs during the

policy period and was not, prior to the policy period, known to have occurred by any insured…, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured … or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)  Reports all, or any part, of the "bodily injury" or "property damage" to use or any other insurer;

(2)  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

….

2.  Exclusions
This insurance does not apply to:

a.  Expected or Intended Injury
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

b.  "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

….

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

….

17.  "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Appellant's App. pp. 284, 285, 287, 298, 299.

### C. The Alleged Environmental Contamination at Cedar Park and the Underlying Suit

7

For a period of some time prior to the execution of the Agreement, a manufacturing facility operated on land just to the east of and adjacent to Section 3 of Cedar Park ("the Source Property"). Sometime between August 2 and 10, 2000, Christopher Shaw of environmental consulting firm Alt & Witzig contacted George by telephone for permission to perform "subsurface investigation, soil boring, [and] well installation" in Cedar Park. Appellant's App. p. 780. During the telephone conversation, Shaw relayed that the Source Property was contaminated, "your property is adjacent [and] as part of our process, we need to sample on your site." Appellant's App. p. 781. George granted permission, and the first soil boring took place in Cedar Park on August 10, 2000. Three monitoring wells were installed in Section 3: MW-12, MW-13, and MW-14, all installed on October 19, 2001. On March 22, 2002, testing revealed Trichloroethylene ("TCE") levels of 95, 12, and 220 parts per billion ("ppb") at wells MW-12, MW-13, and MW-14, respectively, results that were attached to a letter from Alt & Witzig to the Indiana Department of Environmental Management ("IDEM") on April 15, 2002. The report also indicated that the "VRP Tier II Residential Cleanup Goals for TCE = 5.0 µg/L[2] (off-site)[.]" Appellant's App. p. 1025.

Alt & Witzig employees came to Cedar Park on May 1, 2002, to look at the monitoring wells with George and his attorney and informed them of the TCE contamination they had discovered in parts of Section 3. As of May 11, 2004, Alt & Witzig had no data indicating contamination to any more than three lots in Section 3. George later claimed that

---

[2] For dilute aqueous solutions, ppb is equivalent to µg/L. UNITED STATES EPA, *EPA On-line Tools for Site Assessment Calculation*, (March 17, 2014), http://www.epa.gov/athens/learn2model/part-two/onsite/ia_unit_conversion_detail.html ("Similarly, 1 µg/L is referred to as '1 part per billion' or ppb in dilute aqueous solutions because there are 1 billion micrograms in 1 kg.").

he was unaware of any contamination issues before May 1, 2002. Keramida Environmental, Inc., conducted a study of possible TCE contamination in Cedar Park and issued its report on February 23, 2005. *Inter alia*, Keramida took soil gas samples at twelve sample locations in lots owned by KB Home in Section 2 and analyzed the samples for TCE concentration. In its report, Keramida disclosed that "TCE was detected in soil gas from 8 of the 12 sample locations [and] TCE was detected in six soil gas samples from these locations as concentrations above the target soil gas concentration for TCE." Appellant's App. p. 1054. As of June 29, 2007, Section 1 had been entirely built out, Section 2 was built out except for twenty-four undeveloped lots and seven unoccupied homes owned by KB Home, and Section 3 was undeveloped, with all of its lots still owned by George.

On June 29, 2007, KB Home filed suit against George and four other defendants in Marion Superior Court, in Cause Number 49F12-0706-PL-27065, alleging that three of the defendants, who were or had been owners or operators of the Source Property, were responsible for TCE contamination in Cedar Park ("The TCE Defendants"). KB Home also alleged that George knew in May of 2002 that some lots in Section 3 were contaminated but waited until 2004 to inform KB Home of the problem, a period of two years during which KB Home purchased over sixty lots in Cedar Park. Here are the portions of KB Home's complaint relating to the TCE Defendants and George:

### COUNT I—NEGLIGENCE

….
61. The TCE Defendants had a duty to control and maintain the Source Property and/or their operations on the Source Property in a non-polluting manner. The TCE Defendants had a duty not to permit or allow hazardous substances to invade adjacent properties. Further, the TCE

9

Defendants had a duty to respond promptly to any release of contaminants in a manner that would prevent or mitigate further migration of contaminants. Upon learning of the migration of the contaminants, the TCE Defendants had a duty to take action to stop migration and remediate the contamination.

62. The TCE Defendants have breached these duties by their negligent acts and omissions in operating and maintaining the Source Property, by their failure to implement safeguards to assure against the release of contaminants, by their failure promptly and effectively to address the release of contamination, and by their failure to prevent further migration of the contaminants.

63. The TCE Defendants knew or should have known that chemicals such as TCE have the potential to cause harm.

64. As a direct and proximate result of the TCE Defendants' breach of their duties, KB [Home] has suffered and continues to suffer damages.

65. Kopetsky had a duty to timely notify KB Home/Dura of any environmental issues or potential environmental issues that Kopetsky knew or should have known were present or potentially present at Cedar Park.

66. Kopetsky knew and/or should have known of an environmental issue or potential environmental issues at Cedar Park several years before notifying KB Home, and therefore breached his duty to KB Home/Dura.

67. As a direct and proximate result of Kopetsky's breach of his duties, KB Home has suffered and continues to suffer damages.

….

## COUNT II — TRESPASS

….

72. Upon information and belief, the contamination of the air, soil, soil vapor, and groundwater, at, in, or beneath the Cedar Park subdivision persists because the TCE Defendants negligently maintained the Source Property, negligently operated their business, and negligently failed to address the contamination before it migrated into the Cedar Park property.

73. The TCE Defendants' contamination of the air, soil, soil vapor and groundwater and their failure to timely address such contamination interfered with KB Home's right to exclusive possession and use of its property by causing hazardous chemicals from the TCE Defendants' control to enter, without authorization, into KB Home's property.

74. The TCE Defendants' contamination of the air, soil, soil vapor and groundwater and their failure to address such contamination constituted an unreasonable, unwarranted, and unlawful entry into KB Home's property and substantially interfered with the KB Home's reasonable use and enjoyment of their property. Such conduct constitutes a wrongful trespass on KB Home's property.

75. At all times relevant, the TCE Defendants knew or should have

10

known that their actions in causing and/or permitting hazardous chemical to enter KB Home's property were without legal right or authority.

76. The TCE Defendants acted willfully and wantonly and with gross negligence or in reckless disregard of the rights of KB Home.

77. As a direct and proximate result of the TCE Defendants' trespass upon KB Home's property, KB Home has suffered and continues to suffer damages, including but not limited to loss of full and exclusive possession and use of their property and diminution in value of their property.

….

## COUNT III — CONTINUING NUISANCE

….

79. The contamination of the air, soil, soil vapor, and groundwater at, in, or beneath the Cedar Park subdivision occurred and persists because the TCE Defendants negligently maintained hazardous materials on the Source Property, negligently operated their business, and negligently failed to address the contamination before it began to migrate to adjacent properties.

80. The TCE Defendants' contamination of the air, soil, soil vapor, and groundwater and their failure to address such contamination constituted an unreasonable, unwarranted, and unlawful use of the Source Property that has obstructed KB Home's free use of its property. Pursuant to IND. CODE § 32-30-6-6, such conduct constitutes a nuisance.

81. As a direct and proximate result of the TCE Defendants' contamination of KB Home's property, KB Home has suffered and continues to suffer damages, including but not limited to injuries to their property, diminution in the value of their property, and lessened personal enjoyment of their property.

82. The TCE Defendants acted willfully and wantonly and with gross negligence or in reckless disregard of the rights of KB Home.

83. Pursuant to IND. CODE §§ 32-30-6-6 through -8, KB Home is entitled to bring an action to enjoin or abate such a nuisance and to recover damages caused by the nuisance.

….

## COUNT IV — ENVIRONMENTAL LEGAL ACTION

….

85. Pursuant to IND. CODE § 13-30-9-2, a person may bring an environmental legal action against a person who caused or contributed to the release of a hazardous substance into the surface or subsurface soil or groundwater that poses a risk to human health and the environment to recover reasonable costs or removal and remedial action involving hazardous substances.

86. KB Home and the TCE Defendants are each a "person" and TCE is a hazardous substance within the meaning of IND. CODE § 13-30-9-2.

87. The presence of TCE and other hazardous substances in the soil and groundwater on KB Home's property, emanating from the Source Property, poses a risk to human health and the environment.

88. Pursuant to Ind. Code § 13-30-9-3, this court is authorized to award KB Home reasonable costs, including attorneys fees, incurred in bringing this action.

….

## COUNT V—BREACH OF CONTRACT

….

93. Under the Lot Purchase Agreement and the Amended Lot Purchase Agreement, Kopetsky promised that Cedar Park "is free of any Hazardous Materials" and that he would certify with each lot purchase he "has not received any notice from any governmental authority or private citizen concerning the *existence or possible existence* of any toxic or hazardous or regulated waste, material or substance…." (emphasis added)

94. KB Home has complied with all terms, conditions, and other provisions of the Lot Purchase Agreement and Amended Lot Purchase Agreement.

95. Kopetsky has breached the Lot Purchase Agreement and Amended Lot Purchase Agreement for the reasons stated herein.

96. As a result of Kopetsky's breach of the Lot Purchase Agreement and Amended Lot Purchase Agreement, KB Home has suffered damages.

….

## COUNT VI—CONSTRUCTIVE FRAUD

102. A special relationship existed between Kopetsky and KB Home/Dura, as developer and homebuilder of Cedar Park, respectively, such that Kopetsky owed a duty to KB Home/Dura. Further, the relationship between Kopetsky and KB Home/Dura was such that Kopetsky had a duty not to remain silent if Kopetsky knew of the presence or potential presence of adverse environmental conditions at Cedar Park.

103. Kopetsky violated that duty by making deceptive omissions and representations set forth herein and other acts and omissions to be proven at trial.

104. As a direct and proximate result of, and in reliance upon, the deceptive representations and omissions by Kopetsky, KB Home/Dura purchased lots in Cedar Park, built homes on these lots, and sold some of the homes/lots to customers, among other things.

105. KB Home has suffered, and will continue to suffer, substantial damages as a direct and proximate result of Kopetsky's deceptive representations and omissions.

Appellant's App. pp. 694-702.

## D. The Coverage Lawsuit

On April 13, 2009, Indiana Insurance filed a declaratory judgment action against George and KB Home, seeking a declaration that it had no duty to defend and/or indemnify George pursuant to the Policies. On July 28, 2009, George answered and filed a counterclaim, alleging breach of contract and bad faith on the part of Indiana Insurance. On March 29, 2010, counsel notified the trial court of George's death and, on July 29, 2010, moved for substitution of Patricia as a party, which motion the trial court granted. On February 7, 2011, Indiana Insurance moved for summary judgment on its complaint and Patricia's counterclaim. Also on February 7, 2011, Patricia moved for partial summary judgment on Indiana Insurance's claim. Ultimately, the trial court granted summary judgment in favor of Patricia on the coverage question and dismissed her bad faith counterclaim.

## DISCUSSION AND DECISION

### *Standard of Review*

When reviewing the grant or denial of a summary judgment motion, we apply the same standard as the trial court. *Merchs. Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind. Ct. App. 2000). Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Merchs. Nat'l Bank*,

13

741 N.E.2d at 386. To prevail on a motion for summary judgment, a party must demonstrate that the undisputed material facts negate at least one element of the other party's claim. *Id.* Once the moving party has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue does in fact exist. *Id.* The party appealing the summary judgment bears the burden of persuading us that the trial court erred. *Id.*

> [B]ecause the interpretation of a contract is a matter of law, cases involving the interpretation of insurance contracts are particularly appropriate for summary judgment.
> Moreover, provisions of insurance contracts are subject to the same rules of construction as other contracts. We interpret an insurance policy with the goal of ascertaining and enforcing the parties' intent as revealed by the insurance contract. In accomplishing that goal we must construe the insurance policy as a whole, rather than considering individual words, phrases, or paragraphs. If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning.
> Additionally, we must accept an interpretation of the contract language that harmonizes the provision rather than one which supports a conflicting version of the provisions. Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence. If reasonably intelligent persons honestly may differ as to the meaning of the policy language, the policy is ambiguous. However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language.

*Wright v. Am. States Ins. Co.*, 765 N.E.2d 690, 692-93 (Ind. Ct. App. 2002) (citations omitted). "Whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or the contract ambiguity, if one exists, can be resolved without the aid of a factual determination." *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 354 (Ind. Ct. App. 1995), *trans. denied.* As a general rule, "[w]here provisions limiting coverage

are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity." *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998).

> An insurance company's duty to defend is broader than its duty to indemnify. *Seymour Mfg. Co. v. Commercial Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind. 1996). An insurer, after making an independent determination that it has no duty to defend, must protect its interest by filing a declaratory judgment action for a judicial determination of its obligations under the policy or defend its insured under a reservation of rights. *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 902 (Ind. Ct. App. 1992), *trans. denied*. If it refuses to defend it does so at its peril. *Id.…* [A]n insurer may properly refuse to defend where an independent investigation reveals a claim *patently* outside the risks covered by the policy. *Liberty Mut.*, 586 N.E.2d at 901.

*Emp'rs Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1025, 1026 (Ind. Ct. App. 1999), *trans. denied*.

### *Direct Appeal Issues*

### I. Whether KB Home's Allegations Satisfy the Policies' Definition of "Property Damage"

Indiana Insurance contends that the trial court erred in concluding that it has a duty to defend and/or indemnify Patricia because none of KB Home's allegations in the underlying suit would qualify as "property damage" pursuant to the Policies. Indiana Insurance argues that KB Home is alleging damage only to the land it bought, which Indiana Insurance contends does not qualify as property damage pursuant to the Policies because it constitutes an "economic loss." Patricia counters that the contamination does, in fact, qualify as property damage to the land purchased from George and gives rise to a duty to defend and/or indemnify.

The Indiana Supreme Court recently revisited the concept of what may constitute property damage under a typical CGL policy in the case of *Sheehan Construction Co., Inc. v. Continental Casualty Co.*, 935 N.E.2d 160 (Ind. 2010), *opinion adhered to as modified on reh'g*, 938 N.E.2d 685 (Ind. 2010). In *Sheehan*, a general contractor was being sued by homeowners for the allegedly poor workmanship of the subcontractors who actually built the homes in question. *Id.* at 163. The question before the court was whether Sheehan's CGL carrier was obligated to defend and/or indemnify Sheehan in the underlying suit—more specifically, whether the damage to the homes, which was limited to the structures themselves, could constitute "property damage" pursuant to the CGL policy. *Id.*

The *Sheehan* court took note of what some Indiana cases had treated as a general rule regarding whether damage to a product itself could qualify as property damage pursuant to a CGL:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than to the product or completed work itself*, and for which the insured may be found liable.... The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Sheehan Const. Co.*, 935 N.E.2d at 166 (quoting *Ind. Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1279 (Ind. 1980) (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971))). KB Home's claims clearly fall under this general rule, *i.e.*, it is not claiming that the lots it purchased from George have damaged or caused injury to anything or anybody

16

else, only that the lots themselves are contaminated and have therefore caused KB Home economic loss.

After noting the general rule and citing several opinions from this court adhering to it,[3] however, the *Sheehan* court soundly rejected the notion of a general "economic loss" doctrine in the CGL context. In so doing, the *Sheehan* court made the following observations:

> In *DeZutti*[, 408 N.E.2d at 1275,] the Court was addressing the impact on the insurer's duty to defend not based on the insuring provisions or the definition of "property damage" or "occurrence" but rather because faulty workmanship by a contractor was specifically excluded based on the clear and unambiguous "business risk" exclusionary clauses. The policy at issue in *DeZutti* had several exclusionary clauses one of which provided that the policy did not apply to "property damage to the named insured's products arising out of such products or any part of such products." *Id.* at 1277. Another exclusionary provision provided that the policy did not apply to "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith...." *Id.* Examining these provisions we concluded, "[t]hese provisions clearly exclude insurance coverage for damages to the insured's product or work when such damages are confined *to* the product or work and caused *by* the product or work, or *any part thereof.* It is only damage to *other* property arising out of the insured's product or work which would be covered." *Id.* at 1280 (emphases in original).
>
> In essence *DeZutti* relied on the exclusions to determine that no coverage existed in that case. There was no intent to suggest that the broad language regarding the purpose of CGL polices stand for the proposition that faulty workmanship that damages the contractor's own work can never constitute a covered "occurrence." … Indeed we agree with the observations of the Wisconsin Supreme Court that "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this

---

[3] *See T.R. Bulger, Inc. v. Ind. Ins. Co.*, 901 N.E.2d 1110, 1115 (Ind. Ct. App. 2009); *Amerisure, Inc. v. Wurster Constr. Co.*, 818 N.E.2d 998, 1003 (Ind. Ct. App. 2004); *Jim Barna Log Sys. Midwest Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 824 (Ind. Ct. App. 2003), *trans. denied*; *Schultz v. Erie Ins. Group*, 754 N.E.2d 971, 975 (Ind. Ct. App. 2001), *trans. denied*; *R.N. Thompson & Assocs., Inc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160, 162 (Ind. Ct. App. 1997), *trans. denied*.

is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis. 2d 16, 673 N.W.2d 65, 76 (2004); *see also Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.,* 216 S.W.3d 302, 307 (Tenn. 2007) (declaring that "[r]eliance upon a CGL's 'exclusions' to determine the meaning of 'occurrence' has resulted in regrettably overbroad generalizations concerning CGLs" (internal citation and quotation omitted)).

*Sheehan Const. Co.,* 935 N.E.2d at 166-67.

Put another way, the *Sheehan* court recognized that there was no coverage in the *DeZutti* case because certain business risk exclusions applied to the damage in question, *not* because of any overriding "economic loss" doctrine that would prevent a CGL from ever covering losses only recoverable in contract. The proper approach, then, as mandated by *Sheehan*, is to start with the policy language and determine if (1) the loss would be covered under the general coverage clause and (2) if any exclusions apply that would preclude coverage, without regard to whether the loss constituted "economic loss."

As previously mentioned, the Policies define "property damage" as follows:

17. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at a time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Appellant's App. p. 299.

We have little trouble concluding that the contaminated Cedar Park lots KB Home purchased suffered property damage pursuant to the Policies, because the lots, which are "tangible property," have suffered "physical injury." Moreover, as Indiana Insurance

18

concedes, the "business risk" exclusions of the type relied upon by the *DeZutti* court have no applicability in this case. The next step is to determine if the property damage was the result of an "occurrence."

## II. Whether KB Home's Allegations Satisfy the Policies' Definition of "Occurrence"

Indiana Insurance argues that even if KB Home's alleged damages qualify as "property damage," they were not the result of an "occurrence." Essentially, Indiana Insurance contends that the only "occurrence" KB Home alleged in its complaint against George was George's failure to inform KB Home about potential contamination of the lots in question and further asserts that the "property damage," *i.e.*, contamination, was not caused by this alleged non-disclosure. Patricia argues that the "occurrence" alleged by KB Home was, in fact, the migration of pollutants from adjacent property.

We conclude that Patricia is correct. KB Home's complaint alleges negligence, trespass, continuing nuisance, and an environmental action against some or all of the TCE Defendants, alleging that it has suffered and continues to suffer damages as a result. Indiana Insurance's argument is seemingly premised on the idea that the occurrence in question has to have been caused by the insured. This premise has no basis in the Policies' provisions, which do not contain any language requiring that the "occurrence" in question be the insured's fault. As previously mentioned, the Policies define "occurrence" as follows: "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Appellant's App. p. 298. The definition does not address the source of the accident or require that it be any particular party's responsibility.

19

Put another way, under the plain language of the Policies, it does not matter if George bears any actual responsibility for the contamination.[4] We conclude that because KB Home has successfully pled an "occurrence," coverage is not precluded on the basis that it did not.

### III. Whether the Policies' "Expected or Intended" Exclusion Bars Coverage

Indiana Insurance next argues that coverage is precluded pursuant to the Policies' "expected or intended" exclusion, which covers "'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Appellant's App. p. 285. "The 'expected or intended' claim requires consideration of whether, *at the time of the acts causing the injury*, the insured expected or intended the injury, an inquiry that generally asks merely whether the injury was accidental." *Gen. Housewares Corp. v. Nat'l Sur. Corp.*, 741 N.E.2d 408, 416 (Ind. Ct. App. 2000) (quoting *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995) (emphasis added by *Gen. Housewares* court)). Because it is undisputed that George had nothing to do with the actual contamination of Cedar Park when it occurred, he could not have expected or intended the property damage at the time of the acts causing it. The Policies' "expected or intended" exclusion does not work to bar coverage in this case.

### IV. Whether the Policies' "Contractual Liability" Exclusion Bars Coverage

The Policies preclude coverage for "'[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract

---

[4] Indiana Insurance also argues that KB Home has alleged that George's nondisclosures were intentional and therefore could not be "occurrences" pursuant to the Policies because they were not "accidents." Because the actual occurrence pled by KB Home was not something George allegedly did, we need not address this argument.

20

or agreement." Appellant's App. p. 285. Indiana Insurance argues that this exclusion bars coverage because KB Home's allegations all pertain to George's alleged failure to inform it of potential contamination, in breach of the Agreement, under which it argues he "assumed" liability. For her part, Patricia argues that while George may be held liable for entering into the Agreement and subsequently breaching it, this is not the same thing as *assuming* liability pursuant to it. We find Patricia's arguments to be convincing.

Indiana Insurance's argument is premised on the notion that you "assume" liability every time you sign a contract because you may be held liable for breaching it. We do not accept this argument. Although our research has uncovered no Indiana case precisely on point, today we explicitly endorse the proposition that "assumed" liability is liability originally incurred by a third party but then taken on by another. "Assumption" may be defined as "[t]he undertaking or adoption of a debt or obligation primarily resting upon another, as where the purchaser of real estate 'assumes' a mortgage resting upon it, in which case he adopts the mortgage debt as his own and becomes personally responsible for its payment." BLACK'S LAW DICTIONARY 123 (6th ed. 1990). As the Alaska Supreme Court explained in a case interpreting a similar exclusion,

> "Liability assumed by the insured under any contract" refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract. *Continental Insurance Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972); *Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co*., 548 F.2d 681, 684 (7th Cir. 1977); *J. L. Simmons Co., Inc. v. Fidelity and Casualty Co.*, 511 F.2d 87, 96 (7th Cir. 1975); *Haugan v. Home Indemnity Co.*, 86 S.D. 406, 197 N.W.2d 18, 23 (1972). 1 R. Long, Law of Liability Insurance s 1.12 (1981); 2 R. Long, supra ss 10.17, 10.19.1
> [There is an] important distinction between *incurring* liability through

breach of contract and specifically contracting to *assume* liability for another's negligence. *See CM, Inc. v. Canadian Indemnity Co.*, 635 F.2d 703, 708 (8th Cir. 1980). Liability ordinarily occurs only after breach of contract. However, in the case of indemnification or hold harmless agreements, assumption of another's liability constitutes performance of the contract. Because "liability assumed by contract" refers to a particular type of contract—a hold harmless or indemnification agreement—and not to the liability that results from breach of contract, the contractual liability exclusion applies only to hold harmless agreements. 1 R. Long, supra s 1.12, at 1-26.

*Olympic, Inc. v. Providence Wash. Ins. Co. of Alaska*, 648 P.2d 1008, 1011 (Alaska 1982)

(footnotes omitted).

The Utah Supreme Court, relying on *Olympic*, further elaborated and also addressed

what we feel to be very compelling policy considerations:

> The law imposes upon the insured a liability to pay damages for bodily injuries or damage to property caused by his carelessness and arising out of his ownership, maintenance, care, custody or use of property. This is the liability upon which the insurer agrees to pay all sums "which the insured shall become legally obligated to pay." ... "Liability imposed by law for damages," or damages which the insured becomes "legally obligated to pay," excludes liability which the insured may have voluntarily assumed…. An oral or written agreement by the insured to indemnify third persons or save them harmless is excluded from coverage generally assumed by the insurer under a liability insurance policy…. *Union Paving Co. v. Thomas*, 186 F.2d 172 (3d Cir. 1951).

1 Rowland H. Long, Law of Liability Insurance §§ 1.07[1], 1.07[2] (1997). Long suggests that the rationale behind this rule is that "liability assumed by the insured under a contract or agreement presents an uncertain risk" which cannot be determined in advance for the purpose of fixing premiums. *Id*. § 1.07[2], at 1-42.1. Consequently, "[c]ontractual exclusion clauses which deny coverage for liability assumed by the insured under any contract or agreement not defined in the policy relieve the insurer from liability only in fact situations where the insured *would not be liable* to a third person except for the *express assumption of such liability*." *Id*. at 1-44 (emphasis added). This is reasonable in view of the fact that "[a]ll business transactions are entered into according

to some sort of agreement or understanding." *Larsen v. General Casualty Co.*, 99 F. Supp. 300, 302 (D. Minn. 1951), *aff'd*, 196 F.2d 170 (8th Cir. 1952). If the contract exclusion clause excluded all liability associated with a contract made by the insured, commercial liability insurance would be severely limited in its coverage.

*Gibbs M. Smith, Inc. v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 342 (Utah 1997).

Today we join those jurisdictions who have held that contractual liability exclusions in CGL policies bar coverage not for liability incurred by a contract breach but, rather, for liability assumed from a third party, which seems to be the majority position by a wide margin.[5] Consequently, we conclude that coverage is not barred by the Policies' contractual liability exclusion.

## V. Whether Coverage is Barred by the "Known Loss" Doctrine

Indiana Insurance contends that the "known loss" doctrine bars coverage because the designated evidence establishes that George was aware of contamination in Cedar Park before the effective date of the first of the Policies.

The "known loss" doctrine is a common law concept deriving from the

---

[5] *See also, e.g.*, *Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir. 2005) (holding that exclusion applies only where insured assumes liability of a third party); *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 726 (5th Cir. 2000) (holding that the insured was not sued as the contractual indemnitor of a third party's conduct but rather for its own conduct, so the contractual liability exclusion was inapplicable); *ACUITY v. Burd & Smith Constr., Inc.*, 721 N.W.2d 33, 40 (N.D. 2006) (holding that liability assumed by the insured in a CGL policy is "generally understood and interpreted by the courts to mean the liability of another which one 'assumes' in the sense that one agrees to indemnify or hold the other person harmless"); *Am. Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 70 (Wis. 2004) (holding that contractually-assumed liability clause excludes coverage for liability "where the insured has contractually assumed the liability of another, as in an indemnification or hold-harmless agreement"). *But see, e.g.*, *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 128 (Tex. 2010) ("We hold that [the contractual liability exclusion] means what it says: it excludes claims when the insured assumes liability for damages in a contract or agreement, except when the contract is an insured contract or when the insured would be liable absent the contract or agreement."); *Silk v. Flat Top Const., Inc.*, 453 S.E.2d 356, 359 (W. Va. 1994) ("The policy does not extend coverage for breach of contract. It states, in part, that '[t]his insurance does not apply to: ... "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.'").

fundamental requirement in insurance law that the loss be fortuitous. *Pittston Co., Ultramar America Ltd. V. Allianz Ins. Co.* (1997) 3d Cir., 124 F.3d 508, 516. Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place. *Id*. Describing the known loss doctrine, commentators have noted that "losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and insurer, are not proper subjects of insurance." 7 LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE, § 102:8 at 20 (3d ed. 1997).

This principle has been referred to by various names, including "loss in progress," "known risk," and "known loss." RUSS AND SEGALLA, supra, § 102:8 at 20. "Loss in progress" refers to the notion that an insurer should not be liable for a loss which was in progress before the insurance took effect. *Id*. Although the term "known loss" has been limited to those situations where a loss has actually occurred, *see, e.g.*, *Domtar, Inc. v. Niagara Fire Ins. Co.* (1997) Minn., 563 N.W.2d 724, most courts have defined the doctrine to also include losses which are "substantially certain" to occur or which were a "substantial probability." RUSS AND SEGALLA, supra, § 102:8 at 21. Despite some differences between the various labels used, we agree with the Illinois Supreme Court, which noted that the term "'known loss' most adequately describes the doctrine." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 180 Ill. Dec. 691, 607 N.E.2d 1204, 1209-10. Therefore, we will use the term "known loss" to encompass the fortuity principle.

….

[W]e hold that if an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage. This is not to say, however, that parties may not explicitly agree to cover existing losses. Indeed, the known loss doctrine is inapplicable "if the insurer also knew of the circumstances on which it bases the defense." RUSS AND SEGALLA, supra, § 102:8 at 23.

*Gen. Housewares*, 741 N.E.2d at 413-14.

The "known loss" doctrine is also explicitly addressed in the coverage clause of the

Policies:

> b. This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an

"occurrence" that takes place in the "coverage territory."

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured … and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Appellant's App. p. 284.

George testified that he was unaware of any contamination issues anywhere in Cedar Park before May 1, 2002, which was after the first of the four Policies became effective on April 29, 2002. Indiana Insurance, however, argues that several pieces of designated evidence establish that George must have known of contamination issues in Cedar Park prior to April 29, 2002, or that, at the very least, the designated evidence is sufficient to generate a genuine question of material fact.

Indiana Insurance points out that (1) George gave permission for the performance of soil testing and the installation of monitoring wells in August of 2000, (2) George's counsel followed up with Alt & Witzig and one of the TCE Defendants regarding the environmental findings in Cedar Park, and (3) Alt & Witzig filed a report with IDEM stating that there was contamination in Cedar Park on April 15, 2002. George permitted Alt & Witzig to install monitoring wells in Cedar Park in August of 2000, wells which were installed in October of 2001. Although George testified that "[n]obody ever told me nothing" regarding the soil

testing or the wells at the time, Shaw testified that he had, in fact, informed George in August of 2000 that the Source Property was contaminated. Appellant's App. p. 786.

The letter sent on November 20, 2001, to Witzig and one of the TCE Defendants read in part as follows:

> In the past few days, my clients have given permission for certain monitoring wells to be installed on their property located to the west and contiguous to your property. I've been asked to contact you to determine:
> 1. The reason to install the testing wells.
> 2. The purpose of the testing wells and request any environmental reports or information regarding said testing wells.

Appellant's App. p. 807.

On December 17, 2001, Witzig responded, writing,

> This letter is in response to your inquiry of Nov. 20, 2001.
> It was my understanding that [George] knew the reasoning behind the well monitoring on his property. I apologize that he was not previously informed.
> [The Source Property] is presently in the risk based VRP Program to clean up the presence of small amounts of VOC's. These environmental concerns were caused by the use of degreasing agents at the site in the 1980's [sic].
> In the near future – maybe Jan. – I would like to meet with [George] to share the test results and our in efforts in the VRP program.
> I will get in touch with you or [George] after the holidays.

Appellant's App. p 782.

On February 26, 2002, George's counsel sent another letter to Witzig, which provided in part as follows:

> As you are aware, I've sent correspondence to you regarding the monitoring wells on property owned by [George]. In your letter of December 17, 2001, you indicated that you would like to meet with [George] and share the test results.
> As of this date, [George] has not heard from you. I would request that

this matter be accomplished at your earliest convenience.

Appellant's App. p. 805.

On April 22, 2002, George's counsel wrote Witzig a third time, the letter that seems to have resulted in the May 1, 2002, meeting at the site:

> We have still not heard from you regarding the testing wells on the [Source Property] which adjoins my client [George's] property. I would like to suggest that we arrange a meeting the week of April 29th in order to discuss this matter. [George] will be available any morning that week. If you could advise me as to a mutually agreeable time, I will make the necessary arrangements.

Appellant's App. p. 802. We think it also worth noting that the first of the Policies was applied for on April 26, 2002—four days after the third letter was sent—and went into effect on April 29, two days before the meeting with Witzig.

In summary, before the policies went into effect on April 29, 2002, there is designated evidence that George had been informed over one-and-one-half years beforehand that the Source Property was contaminated, and at that time, George had given permission for the performance of soil testing and the installation of monitoring wells in Cedar Park. In December of 2001, Witzig had sent a letter to George informing him that the Source Property was engaged in an environmental cleanup. As April 29, 2002, drew closer, George's counsel had taken steps to arrange a meeting (to take place on or after April 29, 2002) with Witzig to discuss the monitoring wells installed on George's property. While George denied knowing of any contamination anywhere in Cedar Park prior to May 1, 2002, absolute certainty is not required, and, in any event, a trier of fact should decide this question. Overall, the designated evidence creates a genuine issue of material fact as to whether George had actual knowledge

27

"that a loss ha[d] occurred, [wa]s occurring, or [wa]s substantially certain to occur on or before the effective date of the policy[,]" *Gen. Housewares*, 741 N.E.2d at 414,[6] we remand for trial on the question of whether the known loss doctrine bars coverage in this case.

## VI. Whether Indiana Insurance Has Waived any Argument Regarding the Substitution of Patricia as Defendant in the Coverage Lawsuit

Indiana Insurance contends that Patricia's bad faith claim against it must be dismissed because (1) there is no evidence that she was ever assigned any of George's rights under the Policies and (2) she never tendered the defense of the underlying action to Indiana Insurance.

### A. Patricia's Substitution for George as Counterclaim Plaintiff

Indiana Insurance argues that Patricia was never properly substituted as a party in George's counterclaim of bad faith against Indiana insurance. Although Patricia's motion to substitute specifically requested that she be substituted for George as defendant in the underlying and coverage lawsuits, it did not specifically request that she be substituted as counterclaim plaintiff in George's breach of contract claim against Indiana Insurance. Patricia contends that Indiana Insurance has waived this claim for failure to advance it below. We agree with Patricia. As Patricia points out, Indiana Insurance did not object to Patricia's motion to substitute on the basis that she did not request to be substituted as counterclaim plaintiff, file a motion to correct error on that basis, or appeal the order substituting her.

---

[6] We do not, however, accept Indiana Insurance's argument that the April 15, 2002, letter from Alt & Witzig indicates George's knowledge of contamination in Cedar Park. The letter to IDEM was sent along with results of groundwater testing on the Source Property and Section 3. (Appellant's App. 803). The results of the testing seemed to indicate actionable TCE contamination at the sites of MW-12, MW-13, and MW-14, all located in Section 3. (Appellant's App. 1025). There is no indication in the record, however, that George was sent a copy of this letter or otherwise informed of the test results at the time.

28

Most importantly, the trial court's order (from which Indiana Insurance did not appeal) specifically substituted Patricia for George "for the purpose of defending against this cause *and pursuing the counterclaim*." Appellant's App. p. 633 (emphasis added). "A party may not raise an issue for the first time in his motion to correct errors or on appeal that was not raised in the trial court." *Rodgers v. Rodgers*, 503 N.E.2d 1255, 1257 (Ind. Ct. App. 1987), *trans. denied*. Indiana Insurance may not now raise this claim on direct appeal.

### B. Failure to Tender Defense of the Underlying Action

Indiana Insurance argues that because Patricia was never properly substituted for George in the underlying suit, she has no right to assert any claims on her own behalf or to collect any damages for breach of contract because she never tendered defense of the underlying action to Indiana Insurance. "The insurer's duty to defend simply does not arise until it receives the foundational information designated in the notice requirement." *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1273 (Ind. 2009). We conclude that Indiana Insurance's argument on this point is without merit. First, as previously mentioned, Indiana Insurance has waived any argument it might have once had to Patricia's substitution for George in all aspects of the litigation. Second, there is no indication whatsoever that Indiana Insurance's ability to fully participate in the litigation was hindered in the least due to any lack of tender of defense, because it seems clear that they received such a tender from George. *See id.* ("The function of a notice requirement is to supply basic information to permit an insurer to defend a claim."). Patricia is not barred from asserting claims or collecting damages for breach of contract for failure to tender a defense to

29

the underlying action.

## VII. Whether the Trial Court Erred in Concluding that Indiana Insurance Would Ultimately Be Liable for Indemnity

Indiana Insurance contends that the trial court erred in concluding that it would ultimately have a duty to indemnify Patricia for any liabilities covered by the Policies. We agree with Indiana Insurance that the issue of indemnity is not ripe for review on any basis when there has been no finding of liability in the underlying lawsuit. Moreover, as we have already concluded in this coverage action, there remains a question of fact regarding whether Indiana Insurance even has a duty to defend Patricia, much less indemnify her.

### *Cross-Appeal Issue*

## VIII. Whether the Trial Court Erred in Granting Summary Judgment to Indiana Insurance on Patricia's Bad Faith Counterclaim

Patricia cross-appeals, arguing that the trial court erred in dismissing her counterclaim that Indiana Insurance was denying coverage in bad faith. Indiana Insurance argues that there is no evidence to establish that it dealt with George and Patricia in bad faith. As an initial matter, we note that Indiana Insurance filed a motion for summary judgment on this claim to which Patricia responded, and both parties designated evidence related to the claim. Indiana Trial Rule 12(B)(8) provides, in relevant part, as follows:

> If, on a motion, asserting the defense number (6), to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. In such case, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Consequently, we treat the trial court's grant of Indiana Insurance's motion to dismiss as a

30

grant of its motion for summary judgment on that claim, and review it on that basis.

> Indiana law has long recognized a legal duty, implied in all insurance contracts, for the insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993); *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173, 181 (1976). In recognizing a cause of action in tort for a breach of that duty, we have also noted that a cause of action will not arise every time an insurance claim is denied. *Hickman*, 622 N.E.2d at 520. For example, a good faith dispute about whether the insured has a valid claim will not supply the grounds for recovery in tort for the breach of the obligation to exercise good faith. *Id.* On the other hand, an insurer that denies liability knowing there is no rational, principled basis for doing so has breached its duty. *Id.* To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability. *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992).

*Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002).

"Poor judgment and negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Hoosier Ins. Co. v. Audiology Found. of Amer.*, 745 N.E.2d 300, 310 (Ind. Ct. App. 2001), *trans. denied.* Further, "[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Ind. Farmers Mut. Ins. Group*, 591 N.E.2d 1259, 1261 (Ind. Ct. App. 1998).

The question, then, is whether the designated evidence generates a genuine issue of material of fact related to Patricia's bad faith counterclaim. We conclude that it does not and affirm the trial court on this point. Simply put, Patricia has designated no evidence establishing that Indiana Insurance committed anything approaching conscious wrongdoing in denying coverage.

### A. Claim of no "Property Damage"

For support for this argument, Patricia points to Indiana Insurance's complaint, where it states, "The 2002 to 2003 policy is the only policy for which coverage would apply because [George] knew of the alleged 'property damage' as early as May 1, 2002." (Appellant's App. 35-36). Patricia seems to be arguing that this is an admission from Indiana Insurance that KB Home alleged qualifying "property damage" and yet denied coverage. It does not seem to be anything of the kind, however. At the very least, use of the word "alleged" removes this statement from the realm of an admission. Patricia also essentially restates her argument that Indiana Insurance's argument on this point is without merit. While we agree with Patricia on the merits of this issue, this does not establish conscious wrongdoing on Indiana Insurance's part.

## B. Claims of no "Occurrence" and that the "Contractual Liability" Exclusion Applies

Again, Patricia restates her argument that Indiana Insurance's arguments that there is no coverage because KB Home did not plead an "occurrence" in the underlying lawsuit and because the "contractual liability" exclusion applies are without merit, essentially contending that this alone establishes bad faith. Even though we found the arguments wanting, this falls far short of showing conscious wrongdoing.

## C. Claim that "Known Loss" Doctrine Applies

Patricia points to a letter from Indiana Insurance's coverage counsel indicating that, in counsel's estimation, it did not appear that a "known loss" defense could be easily proven in the coverage case. This, however, is not anywhere close to an admission that the defense was completely without merit, only that it would be difficult to prove. Patricia also argues that

Indiana Insurance advanced this defense even though it knew that George did not know of any contamination before the policy period. As we have concluded, however, the designated evidence generates a genuine issue of material fact as to the timing of George's knowledge. Given that we have found some merit in Indiana Insurance's argument on this point, we decline to conclude that it was advanced in bad faith.

### D. Claim that Cedar Park Was not "Designated Premises" in Three of the Four Policies

Patricia contends that Indiana Insurance argued below that it did not have a duty to defend George because Cedar Park was not designated in some of the Policies. Even if Indiana Insurance's argument in this regard was wholly without merit, Patricia has again failed to point to any indication of conscious wrongdoing. We conclude that the trial court did not err in granting summary judgment in favor of Indiana Insurance on Patricia's bad faith counterclaim.

### CONCLUSION

We conclude that KB Home has successfully alleged "property damage" caused by an "occurrence" pursuant to the Policies and that the Policies' "expected and intended" and "contractual liability" exclusions do not work to bar coverage in this case. We also conclude, however, that the designated evidence generates a question of fact as to whether the known loss doctrine works to bar coverage in this case, and so remand for trial on that question only. Moreover, we reverse the trial court's determination that Indiana Insurance is obligated to indemnify Patricia as a question not yet ripe for adjudication. Finally, we conclude that the trial court did not err in granting summary judgment in favor of Indiana Insurance on

33

Patricia's bad faith counterclaim.

We affirm the judgment of the trial court in part, reverse in part, and remand with instructions.

CRONE, J., and PYLE, J., concur.